Our fifth case for this morning is the estate of Dennis Simpson against Gorbett. Mr. Little. May it please the court. As this court is well aware, summary judgment is not intended to be a docket management device. And what happened in this case, instead of construing the non-moving, the fact that issue in favor of the non-moving party, the district court started with an incorrect legal conclusion on page 8 and 9 of their ruling saying that violation of an internal policy can never constitute an Eighth Amendment violation. Do you rely on anything other than the prison policy and common sense to establish that the placement in the top bunk constituted deliberate indifference to his medical needs or a dangerous condition of confinement? Yes, Your Honor. You know, with gravity and common sense being the thing that we're relying on a lot, my client was as big as John Candy at his largest. He was 6'3", 368 when he died. The jail, when he came in, asked for a copy of his ID, he gave him his ID. They knew he was over 350. The jail tested each of their staff on policies, including the top bunk policies when they were hired. They don't deny or dispute that. We have a large man placed in a 30-inch bunk, which is eight inches smaller than the bed that my three-year-old sleeps in. So my question is, are you relying on anything other than the stated policy and common sense? Were there any other facts? Well, yeah, I believe we do have actual knowledge, too. Once they check his ID, see that he's 350, they know that he's obese as well. I mean, that's their policy, 350. They had actual knowledge that he was 350 or more from his ID. They don't have a scale at the jail in Bartholomew County, so we'd also rely on willful ignorance as well. The bottom line is when this court... Do we know that there were lower bunks available, or is it your theory they just should have kept them in the holding cell, or anything other than a top bunk? I do not know if there were lower bunks available. He was in the holding cell, as you pointed out prior, so perhaps if there weren't, he was safe there, he should have stayed there. See, the prison responded to his obvious intoxication by isolating him from rooms that had bunks until his blood level should have, could have reached zero, and at that point, was there any evidence known to the officials that would have alerted them that his alcohol use presented an ongoing medical concern? Sure, yes. Or is your only concern his weight? Well, I will say that the weight, they didn't treat at all, and so we're very concerned about his weight, but we won't concede the alcohol issue because of a few things. You know, number one, they didn't ask when he drank, so applying a burn-off chart that was last updated in 1984 to everybody generally is inappropriate. Second of all, he showed them bloody stool, which is, you know, embarrassing. He took it seriously enough to show them it's an indication of alcohol withdrawal in and of itself. Third, you know, he came in for drunk driving for his second offense. He had been there the weekend before when they put him in the bottom bunk, so they knew what to do. They knew that he was a, you know, a significant drinker. But there's no evidence, is there, in this record about how one treats people with alcoholics, you know, for example. So, for example, there's no medical evidence to suggest that once your blood level, blood alcohol level is zero, you're safe. Or not. I mean, as a matter of fact, if there had been medical evidence, it would have said that it is not safe after your blood alcohol level is zero because that's exactly when things like the DTs start. But, you know, it's, but I don't see any medical evidence one way or the other, and certainly no evidence that the jail people were at all aware of these protocols. Well, number one, they were aware. They even testified in their depositions that they knew of this policy and that they had taken a test. Well, they know the upper bunk policy, but why, what was it that would have alerted them after the 13-hour time in the holding cell where he's, they've talked to him, he's eaten stuff, he's, you know, their burn-off chart suggests that his, I mean, maybe not zero, you know, but his, essentially the alcohol was going to be So where's the deliberate indifference? Certainly, the deliberate indifference, we can argue about whether or not they were appropriately treated his alcoholism. But we cannot argue that they provided no treatment for his obesity. And in the end, we're talking about the most obvious condition. Mr. Simpson was obviously obese. The obvious treatment, the easy treatment was to place him in the bottom bunk. And I think it's important to look at this court's decision in Pettius this summer where a physician's failure to splint and Achilles tendon was deemed to be enough to get to trial. Here, we don't need any medical knowledge. Mr. Simpson is obese. Should we just presume that all obese people are going to fall off the top bunk? When it's 30 inches wide, yes. I mean, when it's 30 inches wide, if you have somebody who's 6'3", 368, you should assume that they're going to fall off the top bunk. That's just being, that's just acknowledging gravity and physics and reasonableness. Well, if they stay still, they won't. But I mean, I guess we don't know how they sleep, right? And there's a video here as well, Your Honor, of the incident. And it's quite clear that Mr. Simpson is sitting up trying to adjust his sleeping position and he falls off. I thought the video showed that he actually has already started having these seizures. The medical evidence doesn't indicate any seizures, Your Honor. It doesn't indicate heart attacks. It indicates a massive brain injury. Right. Is there any testing to see if was suffering from delirium tremens, the DTs? That I do not know. And the brain itself was misplaced by the Marion County Coroner's Office. So we have a few brain slides, but we were unable to get a hold of the brain. That's actually quite a picture. The brain was misplaced. Oh, my goodness. But, Your Honor, one key point we want to point out here is that summary judgment. We shouldn't be deciphering between direct and indirect circumstantial evidence. Evidence is evidence. And when the examination of the evidence in this case was started by ignoring, explicitly on page eight and nine of her decision, she says that this makes a blanket proposition that ignoring a policy can never equal... Well, all she's saying, I think she's saying a harmless enough thing that you agree with, too, in your brief, which is that you need to do more than simply show that somebody violated the Bartholomew County jail policy. Correct. You've argued, and I think I take the point, that perhaps a policy might be evidence of knowledge or it might be evidence of other things, but the Eighth Amendment does not require total compliance with every jail policy in the United States. That's all. Yes, absolutely. Yes. And we would also argue, too, again, that this Court's decision in Pettius is highly instructive here. Okay. If there's no more questions. Thank you. Thank you very much. Mr. Lowe? Here I am. Jeff Lowe on behalf of Johnny York, James Tindall, Travis Harbaugh, Jared Williams, Corey Lehman, and Mark Corbett, named in their individual and official capacities. May it please the Court, we are here today asking the Court to affirm the lower court's ruling in favor of summary judgment in favor of the defendants. When we look at this, we're specifically looking at a couple of issues under the Eighth Amendment. The overriding goal of the Eighth Amendment is to preclude punishment, and nothing about the way these individual officers treated Mr. Simpson indicated that they were punishing Mr. Simpson. Therefore, the district court was correct in finding that the Eighth Amendment rights of Mr. Simpson were not violated by the way these officers treated him. So suppose these top bunks, instead of being 30 inches wide, had been 24 inches wide, sort of a couple of pieces of paper plus. I mean, surely there must be some point at which putting a man of that size on something with no railing, with no protection, would be deliberately indifference in that recklessness sense that Farmer versus Brennan and the other cases discuss. Sure. And what that looks to, Your Honor, in my opinion and in the defendant's opinion, is that looks to the objective nature of the Eighth Amendment analysis. The first prong of an Eighth Amendment analysis is whether there is an objectively serious risk of sufficient harm or serious harm. And in that case, if they're putting someone on a 24-inch bunk who is as large as Mr. Simpson is, then maybe it is. Maybe that's an objectively sufficiently serious risk of harm. Okay. And so now we can take it the other way. This was 30 inches. And so one question is, is it also at least objectively reckless to put Mr. Simpson, or if he was 450 pounds or 500, you know, I mean, there's probably some point at which saying to somebody, that's where you're going to stay, is crazy. A couple of things against that, Your Honor, and I think that it doesn't rise to that level. One, if you watch the video of Mr. Simpson getting into this bunk, he slept in the bunk, fully within the bunk's barriers distance for three hours. He's not hanging over the bunk. He turns over. He moves within the bunk. This video evidence shows that he's able to get up into the bunk. He doesn't have any problem getting into the bunk. He's able to do all of the things a normal person would do sleeping in the bunk. So objectively, and I think that's what Judge Parker relied on, to find that objectively this was not a sufficiently serious risk of harm to Mr. Simpson. Do these bunks have mattresses? They were provided mattresses and blankets, yes. Well, what evidence then is there in the record for instituting the policy that inmates over 350 pounds should be assigned bottom bunks? Sure. Like, is there evidence of past incidents involving these inmates falling? No, Your Honor. The reason, the only evidence that's in the record regarding why this policy was instituted was the health care who helped create this policy and promulgate this policy, and she said that the policy was enacted as a comfort measure for inmates, not as a safety measure. So the only evidence in the record we would posit is that this was a comfort measure, not a safety measure, and therefore, again, going back to your question, Judge, that this isn't an obvious risk. It was done as a comfort measure. So, and if you look at the other, some of the other reasons that people are a comfort measure as well, that it's easier for them, not for safety purposes. So we would argue, but even if we consider that there was an objectively serious risk of harm, there's no evidence that Officer Harbaugh, who was the officer who placed Mr. Simpson in this bunk or in this cell, was aware of the policy. The designated evidence from Deputy Harbaugh clearly establishes, one, he didn't know that he was over 350 or 350. He must have had a pretty good guess, I would imagine, if he was an experienced officer. In fact, I'm sorry to interrupt, Your Honor. No, go ahead. The testimony from Deputy Harbaugh is that I didn't think he was over 350, and so that's the testimony, but the more important fact is that he didn't know that there was a policy that required somebody who was 350 or over to be in a bottom bunk. I thought that Mr. Little said that they have to pass a test, and that's part of the test. It may be part of the test, Your Honor, but he wasn't aware of it at the time. He said his deposition testimony is I was not aware of the policy at the time, and I was made aware of it subsequent. I'm aware of it now, but I wasn't aware of it at the time. So going back to Eighth Amendment jurisprudence, Eighth Amendment says that the actor must be consciously aware of the risk and disregard it. If he's not aware of the risk because he doesn't know the policy and doesn't know Mr. Simpson Waite and can't and doesn't aware that it's a risk, then the Eighth Amendment can't lie. The case is established that that's not an Eighth Amendment violation if the subjective knowledge of the defendant does not require or does not establish that he was aware of the condition and didn't fail to do something about it. In fact, Farmer tells us an official's failure to alleviate a risk that he should have perceived but did not, while no cause for commendation cannot, under our cases, be condemned as the infliction of punishment. Of course, he's a pretrial. Well, I guess he is sort of a punishment. He's in between. He's serving this three-weekend. Correct. So the Eighth Amendment applies. So it's an Eighth Amendment, not Fourteenth. Yes. Not that it makes too much difference, but yeah. And I would go back to, also, Your Honor, Your Honors, with regard to the Eighth Amendment under the medical cases. There was no evidence that any of the medical conditions about which the plaintiff complains, his obesity and his They did know that he was serving this weekend sentence for drunk driving, though. Yes. They know that and that he manages to have a BAC of 0.23 at 10.30 in the morning. They do know that. Which is pretty. But I do want to correct the record that there was no evidence that he was ever asked when the last time he had a drink was, because the record is clear. It's specifically a document from the lower court, document 101-8, page 21 of 34. Sergeant Tindall asked Mr. Simpson when the last time he had a drink was, and Mr. Simpson said midnight. This is 10 and a half hours later. So he was asked. He's still at 0.23. He's still at 0.23. Sergeant Tindall also asked Mr. Simpson, do you anticipate or possibly having signs of alcohol withdrawal? Mr. Simpson said no. These are also clear indications of the record from document at the lower court, 101-8, page 11 of 34. They went through the medical screening with him. They asked him, are you on any medications? He said the only medication I'm taking is Zoloft for anxiety and depression. He did not admit that he was taking a drug for being an alcoholic. He did not admit he was on a certain diet for being obese. They asked him, do you have a history of seizures? His response was no. They asked him, do you have any other medical problems of which we should be aware? His response was no. These were not sufficiently, the alleged conditions of obesity and alcoholism were not sufficiently serious, in our opinion, to cause the need for medical treatment. And he didn't request any medical treatment. He went 10 and a half, or 12 hours, 13 hours in holding cell five, and the only thing that he raised an issue about was blood in his stool, which the plaintiffs did not tie to any relation to, or there's no admissible evidence, any relation to the alleged chronic medical conditions of obesity and alcoholism. The issues in this case are fairly clearly that these officers did not intend to punish Mr. Simpson. They did not punish Mr. Simpson. They took good care of Mr. Simpson. They listened to him when he asked for something. They addressed concerns that he had. The only concern that they didn't address was he wanted to move to a cell with a bunk when they initially put him in the holding cell, and they didn't because that was against their policy. They were not punishing. They did not intend to punish, and the evidence in this case cannot be construed as them punishing Mr. Simpson. They didn't know of a serious risk of harm. There wasn't a serious risk of harm by the placement of him in the top bunk, and no actor was consciously aware of a risk and failed to do anything about it. So in that circumstance, the district court was correct in granting summary judgment for all the defendants. Thank you. All right. Thank you. Anything further, Mr. Little? First of all, it wasn't the only evidence. The only evidence counsel stated was the opinion of their nurse that the policy was intended for comfort. We had a physician who was in charge of the jails in Hamilton County, Cincinnati, Ohio, who said that the reason why Hamilton County has this policy is for inmate safety. The intention of the policy is a question of fact that should have been decided by a jury. So that's one thing. Second of all, Mr. Simpson was morbidly obese. They knew that he was morbidly obese. The weekend before, they knew when he was in custody. The prior weekend, they knew he had sleep apnea. And finally, the state relies on a farmer, which I feel farmer is a very helpful case for us and for Mr. Simpson. And just because a farmer in the concurrence, Justice Blackmun writes, just because the prison staff didn't intend for the injuries to happen, it doesn't relieve the jail of liability. This was an obvious and easy to see medical condition, and it should have been accommodated as it was the weekend before. And with that, thank you, Your Honors, very much. Thank you, Mr. Little. Thank you, Mr. Lowe. We will take the case under advisement.